**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Appeal from the United States |
| | ) | Bankruptcy Court for the Northern |
| STUART M. HANSON, | ) | District of Illinois, Eastern Division |
| Debtor. | ) | |
| | ) | |
| _____ ) | Bankr. No. 09 B 4820 |
| | ) | Adversary No. 09-AP-00457 |
| MICHAEL DEADY, | ) | Hon. John H. Squires |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | Dist. Ct. No. 10 C 7752 |
| | ) | Hon. Robert M. Dow, Jr. |
| STUART HANSON, individually and | ) | |
| d/b/a HANSON & WHITE, LLC, | ) | |
| Defendant-Appellant. | ) | |

**MEMORANDUM OPINION AND ORDER ON APPEAL**

Defendant-Appellant Stuart M. Hanson, individually and d/b/a Hanson & White, LLC ("Hanson"), timely filed this appeal from a final order of the bankruptcy court entering judgment in favor of Plaintiff-Appellee Michael Deady and against Hanson. Following a trial, on July 13, 2010, the bankruptcy court found that Deady had demonstrated that the loans of $350,000 and $49,000 (less a $9,000 payment) that he made to Hanson were non-dischargeable under 11 U.S.C. § 523(a)(2)(A). On October 14, 2010, the bankruptcy court denied Hanson's motion to alter or amend. This Court has jurisdiction pursuant to 28 U.S.C. § 158(a). In considering a bankruptcy appeal, the Court reviews factual findings for clear error, while conclusions of law are reviewed *de novo*. See *In re Midway Airlines*, 383 F.3d 663, 668 (7th Cir. 2003); *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000). As explained below, finding no error of fact or law in the decision of the bankruptcy court, this Court affirms the bankruptcy court's judgment.

# I.     Background

Michael Deady is the owner of Deady Roofing and Construction, Inc. ("Deady Roofing"), an Illinois corporation. Since 1985, Deady Roofing has been in the business of roofing commercial and residential real property. Stuart Hanson was a member and the manager of H&W, an Illinois limited liability company that was in the business of building custom and "spec" homes in the suburbs of Chicago. Hanson was involved in the day-to-day operations of H&W and in the dealings between Deady Roofing and H&W.

In 2005, H&W hired Deady Roofing to provide labor and materials for several construction projects on which H&W was the general contractor. In late 2006, Hanson and Deady discussed the prospect of Deady becoming involved in H&W's construction projects. Deady suggested to Hanson that he become involved with a project that H&W was completing on Colfax Street in Clarendon Hills, Illinois. However, Hanson informed Deady that the project was almost complete and that H&W was not interested in and had no need for Deady's financial participation in that project.

On October 27, 2006, Hanson and Deady met and discussed Deady's participation in other H&W construction projects. At this meeting, Hanson and Deady discussed a project located at 262 South Prospect in Clarendon Hills, which involved the construction of a high-end custom home. *Id.* 75. Hanson took notes during the meeting. His notes reveal that Hanson and Deady discussed the 262 South Prospect project and that the sum of $250,000 to $350,000 was mentioned in connection with the project. According to Hanson's notes, they also discussed other H&W projects located at Colfax and Ruby Streets in Clarendon Hills. Hanson wrote question marks next to the notes on the Colfax and Ruby projects. Underneath the reference to the Ruby and Colfax projects, he wrote "Balance of $500K."

At or about the same time as the October 2006 meeting, Hanson told Deady that he was in the process of forming a new entity to be known as HW Development LLC. According to Hanson, at some point in the future, Deady would have the option of converting his financial participation in H&W into some form of membership interest in HW Development. However, HW Development was never formed. In his statement of facts, Hanson makes no distinction between H&W and HW Development. However, the evidence presented during trial was that Deady's checks were written to H&W (not HW Development), that HW Development never got off the ground, and that Deady never received an interest in HW Development.

After the October 27, 2006 meeting, Deady loaned H&W $350,000. Deady maintains that he and Hanson agreed that these funds would be used solely for the 262 South Prospect project. According to Deady's testimony at trial, Hanson represented that Deady's funds would be used solely for the 262 South Prospect project and he and Hanson did not discuss using this money for any other project. Deady also testified that he would not have loaned the money to H&W if he had known the funds would be used for projects other than 262 South Prospect.

In his testimony, Hanson disputed Deady's testimony that all the loan proceeds were to be utilized solely for the 262 South Prospect project. Rather, Hanson testified that he told Deady that some of the monies would be invested in 262 South Prospect and some would be invested in other ongoing H&W projects. Hanson testified that, even though Deady's checks were made payable to H&W, Deady was really making a "mezzanine" investment in HW Development. In its opinion, the bankruptcy court identified this conflict in the testimony between Hanson and Deady concerning the use of the funds that Deady loaned to H&W as the principal dispute in the matter.

Deady lent $350,000 to H&W in three installments: (1) $100,000 on November 15, 2006; (2) $150,000 on December 18, 2006; and (3) $100,000 on January 18, 2007. These checks were deposited into H&W's operating account as they were received. In January 2007, when Deady tendered the last installment on the $350,000 loan, Hanson gave Deady two documents. The first document was a promissory note dated January 13, 2007, for $350,000 that was signed by Hanson as the managing member of H&W. The note stated that the principal amount of "$350,000, plus 20% of the net project profit on underlying investment projects; relating to the construction project specified, and as defined, in the Venture Agreement [discussed *infra*] * * * shall be due and payable on the day of closing of the sale of the single-family residence specified in the Venture Agreement * * *." Under the terms of the promissory note, H&W was obligated to repay Deady $350,000 and any other amounts that had accrued by or before December 31, 2008. While the promissory note was in effect, H&W also was required to provide Deady with periodic updates and business reviews, including financial documentation as requested.

The second document that Hanson gave to Deady in January 2007 was a venture agreement dated January 13, 2007, which was to govern the agreement between the parties regarding the acquisition and development of real estate. The venture agreement provided that the $350,000 given by Deady would "be used to acquire and enhance real estate projects as discussed." The agreement also addressed how Deady's $350,000 could be converted into a membership interest in HW Development, which had not yet been formed. Until the new entity was formed, the promissory note would remain in effect. The venture agreement defined the term "net project profit" as used in the promissory note to mean "all gross profits and receipts derived by H&W in conjunction with the Construction Projects, less usual and customary costs and expenses incurred and paid in the construction and sale of the aforesaid single-family

residence * * *." The venture agreement did not define the terms "Construction Projects" or "aforesaid single-family residence."

In December 2007 or January 2008, Hanson told Deady that H&W did not have enough funds to complete the 262 South Prospect project. Deady testified that he questioned Hanson about the $350,000 that Deady had loaned to H&W. According to Deady, Hanson assured him that those monies went into 262 South Prospect. Deady further testified that he asked Hanson to provide him with H&W's checking account records to show where Deady's funds went, but that he never received those records until after he filed the underlying adversary proceeding.

Despite the lack of records, Deady loaned H&W additional funds totaling $49,000, in the following installments: (1) $22,000 on January 22, 2008; (2) $13,500 on March 7, 2008; (3) $5,500 on April 3, 2008; and (4) $8,000 on April 3, 2008. After the last installment was paid, Hanson gave Deady a second promissory note in the sum of $49,000. The note was dated April 4, 2008, and had a maturity date of March 31, 2009. It was entitled "PROMISSORY NOTE– Operating Capital." Hanson signed the document as managing member of H&W and personally guaranteed the promissory note. Deady testified that he did not receive the signed note until July 2008.

On April 4, 2008, Hanson sent Deady two e-mail messages. In the first message, Hanson thanked Deady for his "continued support for our business." Hanson then went on to discuss the 262 South Prospect project and the remaining items that were unpaid on that project. In another message later that day, Hanson attached a copy of the promissory note "for the $49,000 operating capital you have contributed this year to keep our business afloat." Then, on May 20, 2008, Hanson sent Deady an e-mail message in which he discussed the $49,000 promissory note and an agenda for a future meeting. One item that Hanson listed as a topic of discussion was

"the project you funded at 262 Prospect."  In his e-mail, Hanson proposed the possibility of selling the real property at 262 South Prospect and noted that such action would "make it a drawn out process for paying you back your significant investment in this project."  He further noted that "[w]e would basically end up having a long term debt to you which [H&W] would repay over time with proceeds from other projects."  The e-mail message also mentioned the idea of Deady taking ownership of 262 South Prospect because "all of the equity in the project was provided by you and Lori [Deady's wife)]."  On May 27, 2008, Hanson sent Deady another e-mail message stating that he wanted to discuss "our options with [262] Prospect * * *."  According to Hanson, some of the options would "mean that your money from this project would be tied up longer than anyone wants."

On June 16, 2008, Hanson again informed Deady that H&W lacked the funds to complete the 262 South Prospect project and that additional monies were needed to purchase appliances.  As a result, Deady loaned H&W $15,635.19 so that H&W could purchase appliances for 262 South Prospect.[1]  H&W spent more than $350,000 on the 262 South Prospect project and, on April 9, 2009, sold 262 South Prospect for $1,100,000.  There is no dispute that the funds Deady loaned to H&W were used on projects other than 262 South Prospect.

Deady did not retain or consult with an attorney to assist him in his dealings with Hanson and H&W.  Deady testified that he had invested in real estate prior to investing with Hanson and H&W and admitted that he did not have any reservations about investing in "spec" homes.  Deady also testified that he did not review any financial information about H&W prior to loaning the $350,000.  He did request financial information prior to loaning the additional $49,000, but he released the funds to H&W even though he never received the financial data.  H&W has not

---

[1]   The bankruptcy court found that this loan was dischargeable, and Deady has not raised an issue concerning the appliance loan on this appeal.

6

repaid any money on the $350,000 note, but Deady received $9,000 on the $49,000 note that Hanson personally guaranteed. H&W did not repay any of the $15,635.19 that Deady loaned the company for the appliances.

On June 5, 2009, Deady filed a five-count complaint against Hanson and H&W. In Counts I and II, Deady alleged that Hanson made a false representation and used deceit to cheat him out of the loan proceeds. Deady also contends that Hanson falsely represented that Deady either would be repaid by December 31, 2008, or would receive an interest in HW Development. Accordingly, Deady maintained that the debts were non-dischargeable under 11 U.S.C. § 523(a)(2)(A). Deady also sought a finding that the debts be excepted from discharge under 11 U.S.C. § 523(a)(4).

The bankruptcy court conducted a three-hour bench trial, at which only Deady and Hanson testified. After hearing testimony, considering the exhibits, and reviewing the closing arguments submitted by the parties in writing, the bankruptcy court issued a Memorandum Opinion dated July 13, 2010 ("Opinion"). In its Opinion, the bankruptcy court ruled that the loans Deady made in the amounts of $350,000 and $49,000 (less a repayment of $9,000) were not dischargeable under 11 U.S.C. Section 523(a)(2)(A) due to misrepresentations Hanson made to Deady and actual fraud committed by Hanson at the time Deady made those loans to H&W. The bankruptcy court found that Hanson represented that the proceeds of those loans would be used solely on the 262 South Prospect, but then used the proceeds of those loans on other projects. The bankruptcy court held that Deady had failed to prove that either debt was non-dischargeable under 11 U.S.C. Section 523(a)(4).

Hanson filed a motion asking the bankruptcy court to reconsider and either alter or amend its opinion. In a Memorandum Opinion dated October 14, 2010 (the "Second Opinion"), the bankruptcy court denied Hanson's motion. Hanson now appeals.

## II. Analysis

The bankruptcy court concluded that Hanson made false representations with respect to the $350,000 and $49,000 loans that Deady made to H&W. Hanson contends that the bankruptcy court clearly erred in its assessment. On appeal, Defendant-Appellant Hanson presents three issues for review: (1) whether the bankruptcy court erred when it concluded that Deady's testimony was more credible than Hanson's—most specifically in regard to Hanson's representation that Deady's funds would be used solely on the 262 South Prospect project; (2) whether the bankruptcy court erred in excusing or disregarding Deady's alleged impeachment as collateral to the main issue; and (3) whether the bankruptcy court erred in finding that Deady's $49,000 loan was not used for the purpose stated by Hanson. Deady frames the central issues as whether Hanson falsely represented to Deady that the funds that Deady was lending to H&W would be used solely on the 262 South Prospect project or also would be used to fund additional projects. In turn, Hanson frames the issue as whether Hanson substantially performed on his agreement with Deady because Hanson spent approximately the same amount of money on 262 South Prospect as Deady invested and because Hanson built and sold the home. Because the issues overlap, the Court will address them as a whole.

### A. Standard of Review

As previously set forth, in an appeal from the bankruptcy court's judgment following a bench trial, this Court reviews the bankruptcy court's conclusions of law *de novo*, and its findings of fact, as well as applications of law to those findings of fact, for clear error. See *In re*

*Davis*, 638 F.3d 549, 553 (7th Cir. 2011) (reviewing the bankruptcy court's findings of fact, including whether the debtor possessed the requisite intent to deceive or defraud, for clear error); *Egan Marine Corp. v. Great Am. Ins. Co. of New York*, --- F.3d ---, Nos. 11-1266, 11-1346, 2011 WL 5924425, at *9 (7th Cir. Nov. 23, 2011) ("In an appeal from a bench trial, 'we review a district court's conclusions of law *de novo*, and we review its findings of fact, as well as applications of law to those findings of fact, for clear error'"); see also Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."); Fed. R. Bankr. P. 7052 (stating that Rule 52 applies in bankruptcy adversary proceedings).

**B.      Discharge under § 523(a)(2)**

The primary benefit of filing for bankruptcy under Chapter 7 is that the financial discharge offered by the Bankruptcy Code gives the debtor an opportunity for a "fresh start." *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011) (citing *In re Chambers*, 348 F. 3d 650, 653 (7th Cir. 2003)). Nevertheless, this privilege is reserved for the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) (internal quotation marks and citation omitted); see *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966 (7th Cir. 1999). The Bankruptcy Code provides that a bankruptcy court "shall grant the debtor a discharge," but then lists a number of exceptions that deny the privilege of discharge to debtors who have been less than honest. § 727(a). The Court construes exceptions to discharge "strictly against a creditor and liberally in favor of the debtor." *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002) (quotation omitted). As noted above, to the extent that Plaintiffs challenge the bankruptcy court's findings of fact, and its applications of law to those findings of fact, this Court's review is for clear error. *Matter of*

*Krehl*, 86 F.3d 737, 743 (reviewing the bankruptcy court's determination of the debtor's intent in the context of § 727(a) for clear error).  The clearly erroneous standard does not permit the Court to overturn the trier of fact "simply because it is convinced it would have decided the case differently."  *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985).  Rather, "where two permissible conclusions can be drawn, the fact finder's choice cannot be clearly erroneous."  *Matter of Bonnett*, 895 F.2d 1155, 1157 (7th Cir. 1990).

Section 523(a)(2)(A) denies discharge for money obtained by "false pretenses, a false representation, or actual fraud * * *."  11 U.S.C. § 523(a)(2)(A).  To prevail on under § 523(a)(2)(A), the creditor must show that the debtor obtained the money "through representations which the debtor either knew to be false or made with such reckless disregard for the truth as to constitute willful misrepresentation."  *Kimzey,* 761 F.2d at 423; see also *Ojeda v. Goldberg*, 599 F.3d 712, 716-18 (7th Cir. 2010) ("In order for a creditor to receive an exception from discharge under 11 U.S.C. § 523(a)(2)(A), a creditor must show that (1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied.").  The creditor also must prove that the debtor acted with an intent to deceive and that the creditor relied on the debtor's misrepresentations.  *Matter of Mayer,* 51 F.3d 670, 674-76 (7th Cir. 1995) ("Reliance means the conjunction of a material misrepresentation with causation in fact."  A misrepresentation is not material if the creditor knows it is false or "possesses information sufficient to call the representation into question * * *."); see also 11 U.S.C. § 523(a)(2)(A).  The Seventh Circuit has held that when a creditor entrusts the debtor with money to use for a specific purpose and the debtor has no intention of using it in that manner, a misrepresentation exists upon which a debt can be held non-dischargeable.  *Matter of*

*Sheridan*, 57 F.3d 627, 635-36 (7th Cir. 1995) (citing *In re Pappas,* 661 F.2d 82, 86 (7th Cir. 1981)).  Proof that the debtor never put the money toward the stated purpose allows a court to infer the requisite intent.  *Id.*

The bankruptcy court concluded that, in order to induce Deady to loan money to Hanson and H&W, Hanson falsely represented that Deady's funds would be used solely on the 262 South Prospect project.  In reaching this conclusion, the bankruptcy court had before it Hanson's notes from the initial October 27, 2006 meeting that have the numbers $250,000 to $350,000 next to 262 South Prospect and no definite numbers next to any other properties.  Deady also testified repeatedly that Hanson represented that the proceeds from Deady's loans would be used solely on 262 South Prospect.  Furthermore, in various e-mails, Hanson referenced 262 South Prospect in connection with Deady's funds, but failed to mention any other project as a target of Deady's funds.

If Deady's loans were not limited to 262 South Prospect, then the dealings between Deady and Hanson raise certain questions. For example, if Deady intended to make an investment in HW Development, a company that Hanson testified already had been formed, why were all of Deady's checks written to H&W?  Furthermore, if Deady intended to make a "mezzanine" investment in multiple projects through HW Development, why did Hanson fail to include in its appendix to the Court any written communications from Hanson to Deady advising Deady in any substantive way of the status of any of those other projects?  The written communications before the Court refer only to Deady's funds applied to the 262 South Prospect project.  Additionally, if Deady was investing in multiple projects, why, when Hanson attempted to work out a financial resolution with Deady, did Hanson reference only the 262 South Prospect property?

If Deady was investing in multiple properties, one would expect that Hanson would have offered to repay Deady's investment from any of the projects in which Deady's funds allegedly had been invested. However, in his May 20, 2008 e-mail to Deady, Hanson stated that when they were next together they needed to "Discuss the project you funded at 262 Prospect." He also mentioned in that same e-mail the idea of Deady taking ownership of 262 Prospect "* * * since all the equity in the project was provided by you and Lori [Deady's wife]." Then, in his e-mail dated May 27, 2008, he referred only to "our options with Prospect," including a potential lease or sale of 262 South Prospect as a way of repaying Deady. None of these e-mails—each drafted and sent by Hanson—reference solutions with respect to other properties. Furthermore, Hanson has not attached to his appellate briefs the exhibits that he claims refute the evidence relied upon by the bankruptcy court.[2] See Appellant's Brief at 21 (referencing trial exhibits that support his position but failing to attach those exhibits to brief or refer to specific language in those exhibits).

In reaching its conclusion, the bankruptcy court also addressed Hanson's bank records. Deady testified that he specifically requested access to Hanson's checks and bank records. If Hanson believed that he had used the Deady loans properly, why did he fail to provide Deady with bank records showing where those funds were applied, instead of ignoring Deady's requests? The requested financial records would have demonstrated that Deady's funds were

---

[2]  Hanson makes reference to certain exhibits that he believes undercut the bankruptcy judge's decision, but he did not include those exhibits in his appendix. As the Seventh Circuit has stressed, it is not the role of the Court to parse the parties' exhibits to construct the facts, particularly when a party does not provide the exhibit. Judges are not "like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991). "Nor are they archaeologists searching for treasure." *Jeralds ex rel. Jeralds v. Astrue,* 2010 WL 4942161, at *7 (N.D. Ill. Dec. 8, 2010) (citing *DiLeonardi,* 181 F.3d 865, 867 (7th Cir. 1999)). It simply is not the court's job to sift through the record to find evidence to support a party's claim. *Davis v. Carter,* 452 F.3d 686, 692 (7th Cir. 2006). Rather, it is "[a]n advocate's job * * * to make it easy for the court to rule in his client's favor * * *." *Dal Pozzo v. Basic Machinery Co., Inc.,* 463 F.3d 609, 613 (7th Cir. 2006).

deposited into H&W's general operating account and that the funds were used for projects other than 262 South Prospect. It was reasonable for the bankruptcy court to infer that Hanson refused to show Deady the records because he didn't want Deady to see what they contained.

Part of the conflict in the testimony in the bankruptcy court involved the two different entities at issue—H&W, the construction company that would construct 262 South Prospect and the entity to which Deady's checks were written, and HW Development, the limited liability company and investment vehicle that eventually would finance the construction of homes other than 262 Prospect. The bankruptcy court rejected Hanson's testimony that the transactions between H&W and Deady were part of an investment scheme in which Deady was making a "mezzanine" investment (as Hanson called it) in HW Development and that Deady's funds could be used on any project that the parties had discussed. Instead, the bankruptcy court accepted Deady's testimony that while Deady and Hanson discussed future investments in other projects, Hanson represented to Deady that the $350,000 and $49,000 loans were to be used solely by H&W on 262 South Prospect and that Deady relied on those representations in making those loans. Given that HW Development was never formed and no checks were written to HW Development (in addition to the evidence described previously), the bankruptcy court does not appear to have clearly erred in its conclusion.

Hanson also argues that Deady was impeached on the central issue in this matter— whether the $350,000 would be used solely for the 262 South Prospect project—and not on "collateral issues." Hanson claims that Deady contradicted his own complaint by testifying that the loans were to be used on only 262 South Prospect, when his complaint stated that the loans were to be used for three projects. Hanson maintains that Deady's impeachment was not collateral and that it was error for the bankruptcy court to reach that conclusion.

As pointed out by Hanson, the bankruptcy court noted in its opinion that both parties were impeached at trial, but concluded that the impeachment of Deady focused on "related collateral issues" because it dealt with how Deady characterized his investment in Hanson's company. Deady testified at trial that he understood that the Venture Agreement allowed him to roll over the $350,000 investment into an entity that was to be created, receive a membership interest in that entity, and participate in other projects. However, this other entity—HW Development LLC—was never created. Whether the bankruptcy judge characterized the impeachment as collateral to the central issue or not, the fact remains that in spite of the impeachment, the bankruptcy judge still believed Deady's testimony over Hanson's. This conclusion is supported by the evidence presented at trial. Deady repeatedly testified that, at the time he turned over his funds, Hanson represented to him that the loan proceeds would be used solely for the 262 South Prospect project. The record also reflects communications between the parties that were full of references to 262 South Prospect and devoid of reference to other properties. Confronted with whether to accept certain allegations in a complaint or rely on the testimony and evidence presented at trial, the Court cannot conclude that the bankruptcy court clearly erred in deciding that any impeachment of Deady did not warrant discharge. Although the impeachment of Deady gives the Court some pause (and does not appear to have been entirely "collateral"), it is not sufficient in quantity or quality to overcome the fact that the bankruptcy court listened to the live testimony of the witnesses and made findings, based largely on its perception of the credibility of the only two witnesses who testified and their testimony as a whole. The bankruptcy court concluded that the demeanor of the witnesses, the documentary evidence, and communications between the parties all favored Deady. On balance, this Court sees no error in that assessment and in fact tends to agree with it.

Hanson also contends that the integration clause in the Venture Agreement superseded the prior dealings between the parties. By virtue of the parol evidence rule, an integration clause prevents a party to a contract from basing a claim of breach of contract on agreements or understandings, whether oral or written, that the parties had reached during the negotiations that eventuated in the signing of a contract but that they had not written into the contract itself. However, an integration clause has no import in cases involving fraud. See *Vigortone AG Products, Inc. v. PM AG Products, Inc*., 316 F.3d 641, 644 (7th Cir. 2002); *Bidlack v. Wheelabrator Corp*., 993 F.2d 603, 608 (7th Cir. 1993). Fraud is a tort and the parol evidence rule is not a doctrine of tort law, thus an integration clause does not bar a claim of fraud based on statements not contained in the contract. "Doctrine aside, all an integration clause does is limit the evidence available to the parties should a dispute arise over the meaning of the contract. It has nothing to do with whether the contract was induced * * * by fraud." *Vigortone AG Products,* 316 F.3d at 644.

Hanson also argues that the promissory notes and the Venture Agreement corroborate his testimony that Deady's funds were to be used by H&W for multiple projects. First, the promissory note dated January 13, 2007, stated that the principal amount of "$350,000, plus 20% of the net project project on underlying investment projects; relating to the construction project specified, and as defined, in the Venture Agreement * * * shall be due and payable on the day of closing of the sale of the single-family residence specified in the Venture Agreement * * *." The Venture Agreement provided that the $350,000 loaned by Deady would "be used to acquire and enhance real estate projects as discussed." The Venture Agreement also addressed how Deady's $350,000 could be converted into a membership interest in HW Development, which had not yet been formed. The term "net project profit" as used in the promissory note was defined in the

Venture Agreement as "all gross profits and receipts derived by H&W in conjunction with the Construction Projects, less usual and customary costs and expenses incurred and paid in the construction and sale of the aforesaid single-family residence * * *." Finally, the second promissory note dated April 4, 2008 for the $49,000 loan was entitled "PROMISSORY NOTE— Operating Capital."

The documents described refer to "underlying investment projects," "construction project specified," "single-family residence," "Construction Projects," and "aforesaid single-family residence," however, none of these terms are defined in the first promissory note or the Venture Agreement. The bankruptcy court concluded that the fact that some of these phrases are plural and could reference several projects and that other terms are singular and could reference a single project does not weigh heavily in favor of either party, simply because of the ambiguity and absence of definitions in the documents. However, the bankruptcy court did note that ambiguities are construed against the drafter of the document—in this case Hanson—and thus concluded that the documents did not definitely demonstrate that Deady's loans were to be used on multiple projects.

Hanson also points to the phrase "Operating Capital" in the title of the $49,000 promissory note and language in two April 2008 e-mails in which he thanked Deady (i) for his "continued support for our business" and (ii) "for the $49,000 operating capital you have contributed this year to keep our business afloat" in support of his argument that the loan proceeds were to be used by H&W on multiple projects. The bankruptcy court rejected this argument, noting that the first e-mail went on to discuss solely the 262 South Prospect project and the items that went unpaid on that project. In another e-mail, Hanson referenced the $49,000 note but primarily discussed the 262 South Prospect project, without reference to Deady funding

any additional projects. Furthermore, Deady testified that in December 2007 or January 2008, Hanson approached him and said that if he did not receive more funding, Deady would lose the $350,000 that he previously loaned Hanson for the 262 South Prospect project. Then, in March 2008, Deady testified that Hanson again told him that he needed additional funds to keep Deady from losing his investment and the company from "going under." Deady stated that he gave Hanson the additional $49,000 because he did not want the company to go under and he wanted to see the project completed. The fact that the note contained the phrase "Operating Capital" is not outcome determinative of the issue, as the term was not defined in the note and the language could be construed as operating capital for the 262 South Prospect project. Because the meaning was unclear, the bankruptcy court looked to the e-mail communications, heard testimony on the issue, and ultimately resolved the issue in favor of Deady. The evidence supports the bankruptcy court's conclusion that Hanson induced Deady to loan the $49,000 by connecting the money to the 262 South Prospect project.

Hanson also maintains that Deady's fraud claim cannot be reconciled with the fact that H&W spent more than $350,000 on the 262 South Prospect project. The record reflects, and the bankruptcy court found, that H&W spent $397,000 on 262 South Prospect. The record also reflects that some of Deady's $399,000 was spent on 262 South Prospect, but that his loan proceeds were not restricted solely to that project. The record further reflects that Hanson admitted that he could not track how Deady's funds were spent. Hanson maintains that because an almost equivalent amount of money was spent on 262 South Prospect, there was no intent to deceive.

In *Matter of Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995), the Seventh Circuit concluded that the bankruptcy court "appropriately recognized the fungibility of money and found that

absent a segregation provision, the important question is whether the debtor made use of equivalent amounts of money in the required manner." *Id.* at 636. What Hanson fails to appreciate is the distinction that the court of appeals drew in regard to cases in which a debtor puts either no money or only a portion of the loan proceeds toward the purpose given in the loan request. In those instances, the amount of the loan not used in the required manner is non-dischargeable. *Id.* Both the bankruptcy court and the Seventh Circuit in *Matter of Sheridan* found that the debtor did use all of the money loaned for the purposes represented on his draw requests.

Here, if the only funds allocated to construct 262 South Prospect were the loan proceeds (totaling $399,000) that Deady invested, then the reasoning in *Matter of Sheridan* would suggest that Hanson's debt would be dischargeable. In other words, if Hanson indicated to Deady that the cost of construction would be approximately $400,000 (all of which was to come from Deady) and Hanson then spent $397,000 on construction, then, consistent with *Matter of Sheridan*, Hanson would have made use of equivalent amounts of money in the required manner, and it would be immaterial that he comingled the funds and used some of Deady's funds to pay for other projects. However, the record reflects that Deady was only funding a "budget gap" on 262 South Prospect, not the entire project. The sole exhibit that Hanson attached to support his point is Trial Exhibit 8, which reflects the "262 Prospect Breakdown" to be $397,495. However, the document also reflects that an amount of $152,999 in equity was carried forward, suggesting that only $244,496 was spent on 262 South Prospect after Deady became involved (and not the full amount he invested).

In any event, the bankruptcy court determined that the money was not used properly, and it is Hanson's burden on appeal to show clear error. Hanson has not demonstrated that Deady

was to fund the entire project or attempted to explain the "equity" referenced on Trial Exhibit 8. Either scenario distinguishes this case from *Matter of Sheridan*. As Deady pointed out, in *Sheridan*, there was a "one for one dollar exchange that the debtor could show and the total amount spent matched the total loaned for the specific purpose." Here, the Court cannot conclude that a one for one exchange occurred and thus the mere fact that Trial Exhibit 8 reflects $397,000 spent on the 262 South Prospect project does make this case just like *Matter of Sheridan*. As the bankruptcy court noted, "[s]imply because the company [H&W] spent more than $350,000 on the project does not mean that all of those monies were in fact [Deady's] funds. Indeed, [Hanson] admitted that he used [Deady's] funds for projects other than 262 South Prospect." Likewise, Hanson has failed to explain what the amounts on Trial Exhibit stand for, particularly the reference to "equity" carried forwarded as of November 2006. Either way, it was Hanson's burden on appeal to demonstrate the clear error in the bankruptcy court's reasoning and he has failed to do so.

Hanson also argues that he did not have the requisite "intent to deceive" because he substantially performed by building and then selling 262 South Prospect. Hanson fails to cite any Seventh Circuit or Northern District of Illinois cases in support of this proposition. Instead, he cites a case from another jurisdiction and *Sheridan* and reiterates his previous argument that "drawing on a general operating account for other projects is immaterial and not evidence of fraud since Hanson spent more than $350,000 on the project." The Court previously rejected this argument on the facts of this case (or at the least the record presented on appeal).

The remainder of the bankruptcy court's findings flowed from its conclusion that Hanson made false representations to Deady that the proceeds from both the $350,000 and $49,000 loans would be used solely on 262 South Prospect. Hanson admitted that, immediately after receiving

those funds, he deposited them in H&W's general operating account and began using them as he saw fit, including spending the funds on projects other than 262 South Prospect. When Deady asked for an accounting from Hanson as to where his funds had gone or how they were being used, Hanson failed to give Deady access to H&W's checking account ledger or provide other financial documents indicating how the money was being spent. Hanson's refusal to turn over the financial records only bolsters a finding of fraudulent intent premised on Deady's testimony,[3] as the records would have shown that the money was deposited in the general operating account and used for projects other than 262 South Prospect.

At the end of the day, Hanson asks the Court to substitute its judgment for that of the bankruptcy court on the issue of the parties' credibility. However, as previously noted, where two permissible conclusions may be drawn, a court should not conclude that the fact finder's choice was clearly erroneous. *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 309 (7th Cir. 1988). And as particularly relevant here, special deference must be accorded to credibility determinations "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson*, 470 U.S. at 575; see also *In the Matter of: Donald Weber And Roxanne Weber*, 892 F.2d 534 (7th Cir. 1989). The bankruptcy court made clear that Deady was the clear winner in its assessment of the credibility of the only two witnesses who testified in this case. In order to disturb this finding, the Court would have to determine the credibility of witnesses whom it has

---

[3] Hanson contends that intent to deceive is determined by the debtor's subjective intention at the inception of the debt. However, as the bankruptcy court noted, it is well established that courts can consider subsequent conduct as long as that conduct provides an indication of the debtor's state of mind at the time of the actionable representations. *6050 Grant, LLC v. Hanson*, 2010 WL 3907122, at *3 (Bankr. N.D. Ill. Oct. 5, 2010) (collecting cases). Determining whether a debtor had the requisite intent under § 523(a)(2)(A) is a factual, subjective inquiry decided by examining all of the relevant circumstances, including those that took place when the debt was incurred. *Id.* Here, the bankruptcy court considered all of the evidence and determined that it presented "a picture of deceptive conduct" by Hanson, indicating an intent to defraud Deady.

never seen nor heard.   The bankruptcy court clearly was in a better position to judge the witnesses' credibility.   See *Carnes Co. v. Stone Creek Mech., Inc.,* 412 F.3d 845, 848 (7th Cir. 2005) (noting that this Court affords "deference to the trial court's assessment of witness credibility," and recognizing that a trial court's credibility determination "can virtually never amount to clear error") (citation omitted); see also *In re Davis*, 638 F.3d 549, 554 (7th Cir. 2011).   The Court does not find clear error in the bankruptcy court's decision to believe Deady over Hanson, nor in its assessment of the documentary evidence presented at trial.

**III.   Conclusion**

For the foregoing reasons, the decision of the bankruptcy court is affirmed.

Dated:  March 19, 2012

_____
Robert M. Dow, Jr.
United States District Judge